# Sonman Shaft Coal Co. v. Pennsylvania R. R. Co., Appellant.

*Common carriers—Railroad companies—Refusal to supply cars —Courts—Jurisdiction—Federal and state courts—Interstate commerce—Police power—Damages—Measure of damages.*

1. Where a duty has been imposed upon a carrier by the common law and the statutes of a state, as well as by a federal statute, an action for breach of such duty, except as other reasons may be shown, may be maintained in the state courts.

2. In an action in a state court, to recover damages from a railroad company for breach of its common law duty as a carrier to furnish adequate transportation facilities, in that it refused to furnish plaintiff with sufficient coal cars, where defendant questioned the jurisdiction of the court, alleging that it was a carrier engaged in interstate commerce, and that such practices as those complained of had been the subject of federal legislation, and could be examined and controlled only by the interstate commerce commission, and by the federal courts, under the provisions of the Interstate Commerce Act, the jurisdiction of the state court to entertain the action was properly sustained, as the police power of the State extends to compelling common carriers to furnish the public adequate service, and the exercise thereof in such case could but indirectly affect interstate commerce.

3. A verdict for plaintiff in such case was sustained, where it appeared from the evidence that during the period when the default complained of occurred, defendant had a surplus of cars stored on its tracks, which it refused to supply to plaintiff, that defendant always had an adequate supply of cars under normal conditions, but no abnormal conditions were set up as an excuse for defendant's default, and further that gross discrimination had been practiced in supplying cars to other companies.

4. Damages in such case may be recovered, measured by the loss of profits on coal not mined, because cars were not furnished to ship it, and by the increased cost per ton of producing coal mined, over what the cost would have been had cars been furnished up to the capacity of the mine.

Argued April 22, 1913. Appeal, No. 30, Jan. T., 1913, by defendant, from judgment of C. P. Clearfield Co., May T., 1909, No. 322, on verdict for plaintiff in case of

Sonman Shaft Coal Company v. Pennsylvania Railroad Company. Before FELL, C. J., BROWN, MESTREZAT, STEWART and MOSCHZISKER, JJ. Affirmed.

Trespass for unlawful discrimination and for failure to furnish an adequate supply of coal cars. Before SMITH, P. J.

The facts appear in the opinion of the Supreme Court and in the following opinion of SMITH, P. J., sur defendant's motion for a new trial, and for judgment n. o. v.:

The first position taken by the learned counsel for defendant is, that this state court does not have jurisdiction to entertain the action. The plaintiff in this case, by its declaration, set out two causes of action, namely, first, discrimination proper, and, second, insufficient and inadequate car supply in violation of the common law duty of a common carrier. The jurisdiction of this court in cases of discrimination has been affirmed by our Supreme Court in Puritan Coal Mining Company v. Pennsylvania Railroad Company, 237 Pa. 420, as also in Walnut Coal Company v. Pennsylvania Railroad Co., 237 Pa. 410. The recovery in the case in hand was based on the inadequacy of car supply only. While there was distinct proof of discrimination practiced by the defendant company, yet the data on which a recovery could be based was not furnished. The question in this case as to jurisdiction, therefore, is as to whether the federal tribunals have exclusive jurisdiction over a matter of common law duty. The learned counsel for defendant relies on the authority of Southern Railway Co. v. Reid, 222 U. S. 424, which was a case involving a North Carolina statute, to sustain its position that the state court in this case did not have jurisdiction of this cause. We fail to see how that case is applicable to the case in hand. The decision there is based on a square conflict between the North Carolina statute and the act of congress regulating interstate commerce. The question of

the common law duty of furnishing an adequate car supply is not even referred to in the decision. That case moreover deals with the rate question rather than with the car supply question, and indeed in the matter of rates the Interstate Commerce Act seems to cover about all that can be said in the matter of regulating interstate commerce as to rates. All of the cases in fact in the United States Court, in which the jurisdiction of the state courts has been denied, was based on a clear case of conflict between the provisions of a state statute and the Interstate Commerce Act. Where such conflict does not exist the express language of the twenty-second section of the act to regulate commerce, which reads as follows: "Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute but the provisions of this act in addition to such remedies" would seem to apply. In the case in hand, involving as it does the question of adequacy of car supply, a careful reading of the Interstate Commerce Act does not disclose to us any possible conflict of authority. The Federal Supreme Court, moreover, had distinctly recognized the right of redress in other jurisdictions, in the language of Mr. Justice WHITE in the Texas and P. R. Co. v. Abilene Cotton Oil Co. case, 204 U. S. 426-446, when he said, "The manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the act should be regarded as cumulative when other appropriate common law or statutory remedies exist for the redress of the particular grievance or wrong dealt with in the act." Again, the United States Supreme Court, in Galveston, H. & S. A. R. Co. v. Wallace, 223 U. S. 481, upheld the jurisdiction of the state court for damage caused by failure to deliver goods which was recognized as a common law breach of duty and not within the provisions of the Interstate Commerce Act. In that case the court said, inter alia, "jurisdiction is not defeated by implication." The recovery in

the case in hand was limited by the court to intrastate shipments, including of course cars sold f. o. b. at the mines. It is hard to see how the question of exclusive jurisdiction in the United States Court could be made to apply to such shipments within the State and certainly no authority cited by the learned counsel takes such a position.

Without further elaboration of argument, we think it is clear that the most recent authorities of both the state and federal courts sustain the right of the plaintiff to maintain this action.

Defendant's brief contends:

"II. Defendant not in default because unable to supply all the cars demanded by plaintiff."

The elaborate argument of the learned counsel in their brief under this head is not convincing that any error was committed by the court. It ignores or glosses over a primary principle which should govern common carriers. The primary duty of a railroad company, in ordinary times and under ordinary conditions, is to have an adequate car supply for the needs of the country through which the lines pass and to furnish such cars to shippers when requisition therefor is made in good faith. In this respect the coal business does not differ from any other business, although the defendant railroad company seems to have taken the position that they have a right to regulate the coal market. The rule in this respect is clearly expressed in 5 Am. & Eng. Ency. of Law, pp. 160, et al., as follows: "The duty of carriers embraces, not only the duty to transport goods accepted by them, but to do so promptly and within a reasonable time. But in the case of railroads and similar companies, endowed with special and unusual powers with express view to their rendering to the public a freight and passenger service adequate to the needs of the county through which their lines pass, the law imposes the obligation to have and to furnish sufficient facilities for the reasonably prompt transportation of goods ten-

dered for carriage, and they are liable for a failure to transport promptly, whether the failure is due to a want of facilities or to a captious refusal to carry." The only question in this case was whether the defendant fulfilled this duty, and the jury have decided that it did not. Both the plaintiff and defendant in this case, by their proofs, sustained the verdict of the jury in favor of the plaintiff. There was no contention, for instance, against the plaintiff's claim that it had a mine equipped and able to ship the coal which it claimed it could have shipped. There was no serious contention against the claim of plaintiff that it had a market or trade within the State of Pennsylvania for the coal which it claimed it could have mined and sold at a profit. There was no denial of the fact that the plaintiff made requisitions upon the defendant company for cars and facilities for shipping coal to a much greater extent than it received such facilities and nearly up to its actual rating by the railroad company. There was no denial that the railroad company absolutely failed or refused to furnish the cars demanded, and neither then nor now can give any legal or equitable excuse other than its claim that it had a right to pro rate its cars and did not have a sufficient number to give everybody all the cars that were demanded. Further, the proofs on both sides show that the conditions of the bituminous coal trade were normal and the defendant company proved conclusively that it had a surplus of cars and in fact stored cars during a portion of the period. In the face of these admitted facts we are wholly unable to see how there could be anything else than a recovery for such an amount in damages as the plaintiff has shown it sustained. The defendant company's counsel took pains to prove conclusively that they had an adequate car supply for the needs of the business in the region. In the testimony of J. W. Manly, one of defendant's witnesses, page 250, appears the following evidence: "Q. Have you a record there for April 28, 1904? A. Yes, sir. Q. What are

shown to be the empty cars by that record to have been on the Pennsylvania Railroad lines, empty bituminous coal cars; they would be stored cars what I mean by that? A. We have on that date 900...... Q. Were or were not there unused and stored bituminous coal cars on the lines during the period of this action? A. Yes, sir." Then again, in the testimony of G. W. Creighton, General Superintendent, page 246, appears the following: "Q. During the time of this action from April, 1903, to that time in 1907 was there any time when the bituminous coal equipment, any percentage of them were not being used by the shippers? A. I imagine there were, yes. By Mr. Liveright: We object to the answer and ask to have it stricken out. A. I can answer it positively...... Q. Were there coal cars stored and unused during that time? A. Yes." This testimony was offered by the defendant and the purpose for which it was offered was thus stated by counsel: "...... and that there were also empty cars, bituminous coal cars, on their tracks unused during the period proposed to be testified to. This for the purpose of showing that at the time which the testimony is directed, at such period as the witness may testify to, there was an adequate equipment in the control and use of the Pennsylvania Railroad Company to furnish equipment for these shippers of bituminous coal." It was further proven by the cross-examination of G. E. Oler, defendant's witness having charge of the distribution records of the defendant company, the large number of cars each year which were not counted in the general allotment but which under the law should have been so counted. In view of this testimony it would seem that the defendant company had in view some other object in the bituminous coal trade rather than its duty as a common carrier. The elaborate argument of counsel for defendant wholly ignores defendant's own proof in this regard and does not justify the claim that it had a right during the period to make

a pro rata distribution, thereby ignoring the requisitions of the plaintiff. The defendant's counsel assumes the proposition "that the demands of its shippers exceeded in the aggregate the cars which it had available for delivery to them," and hence that it was obliged to make a pro rata distribution in accordance with some fair system. The proofs do not sustain such assumption, especially in view of the fact that idle cars were on sidings during the period. But even assuming the correctness of the statement, defendant company is not relieved. Their method of distribution does not disclose "a fair system." Moreover, discrimination or preference in car distribution of the rankest kind was shown, and this, in our judgment, the jury had a right to take into consideration in arriving at a conclusion as to whether the defendant did its full duty by the plaintiff in furnishing an adequate supply of cars. Independent of the question of discrimination, however, the method of distribution in the region in which the plaintiff operated was to give it only a proportion of the unallotted cars after giving to the preferred shippers its full quota of individual, Pennsylvania railroad fuel supply and foreign fuel supply cars. This method of distribution has not met the sanction of any court and cannot be made the basis of any defense against an action such as is here to be determined.

Defendant contends:

"III. No demand made by plaintiff for any other cars than those to which it was entitled under the system of distribution pursued by the defendant."

As we understand the argument of the brief under this head, it is that the plaintiff company did not show such demand as would indicate that it wanted any other distribution than the method of pro rata distribution followed by the defendant company during the period. The evidence clearly shows that the plaintiff company followed the method of making demand prescribed by the railroad company and through the proper sources.

That the principal officers of the defendant company knew that the plaintiff company was not satisfied with its car service appears conclusively from the testimony of Mr. McCormick and Mr. Cameron, who even went so far as to approach personally the president of the railroad himself. What else they could do other than they did, it is hard to understand. The letter exhibits show an earnest effort to get cars and a protest against their treatment in not receiving them. This testimony, without quoting it, is a sufficient answer to any controversy raised by the discussion under this head.

Defendant contends:

"IV. Rejection of testimony offered on behalf of defendant to prove the number of cars off the defendant's lines which would otherwise have been available for coal shipments."

It is hard for us to understand how the offer in question was competent in any phase of the case as tried. In the first place it was proven conclusively that the coal trade conditions during the period of the action was normal. In the second place it was proved conclusively by the defendant's own witnesses, and purposely so proven, that they had an abundant supply of cars, so much so that unused cars were left standing on their sidings. In the third place, an adequate and sufficient supply of cars of the defendant company means of course that at any and all times there must be bituminous coal cars off the lines of the defendant company and on lines of other railroad companies doing a legitimate coal trade business. The offer does not attempt to show that during the period of the action there was anything extraordinary in the number of cars off their lines, and this only could be made as a basis of a defense. If they had an adequate and sufficient supply of cars for the legitimate coal trade, that presupposes a certain proportion of such adequate and sufficient supply of cars engaged in interstate commerce and off the lines of the defendant company's road. In no sense then could

it be a defense to the action merely to attempt to prove that during the period of the action certain cars were off its lines and not available for distribution. In the ordinary course of trade and movements of cars the cars off defendant's lines would be returned, again to be distributed to the coal trade. The offer itself does not purport to include a proposition, which would be a legitimate defense to the claim of the plaintiff, that it was furnished an inadequate supply of cars, because the railroad company in this case took pains to show that the times were normal; that there was no extraordinary demand and no shortage of cars, in fact a surplus of cars. The proof moreover is conclusive that a very large number of cars during the entire period of the action were held by the defendant company for special distribution and also under an unfair system of distribution not allotable to the plaintiff company. In view of this proof, it seems to us wholly immaterial and unimportant what equipment the defendant had on foreign lines. If, as a matter of fact, the cars which it had on foreign lines were simply those in the ordinary course of trade and no greater during the period of the action than at any other time, it could not be a defense in any respect.

Defendant contends:

"V. Refusal of the court to allow the witness, Frank J. Heverly, to testify as to the number of empty cars standing over at the plaintiff's mines, as shown by the distribution sheets."

The testimony involved in this offer is merely a repetition of the contents of the distribution sheets offered in evidence. The witness was not offered as an original witness of anything, but simply to repeat what he found on certain sheets. These distribution sheets were offered by the plaintiff and were admitted in evidence for all purposes for which they could be legitimately used by either side. The witness called to prove the facts about which complaint is made could not testify to anything other than appeared on the sheets, which he himself did

not make up and knew nothing about except as it appeared on those sheets. Had the offer been to show a summary of certain facts appearing on the sheets, it might have been competent, because this was the method of procedure adopted in the course of this as well as other trials of a similar nature. But to allow the witness to merely repeat what appeared on those sheets neither gave the jury any light on the subject and was only encumbering the record with what was already thereon. The sheets being in evidence it was perfectly competent for counsel themselves in argument to the jury or to the court to use any summaries of facts contained therein. Counsel for defendant certainly understood this fully, for the same counsel have been engaged in other cases of like nature and tables of all kinds have been used, both those prepared by counsel themselves and those prepared by other persons and deductions made therefrom, which tables have uniformly been allowed for use of counsel, the court and jury. That, however, was not the proposition in this case. The offer, if we understood it at all, was simply to have a man, who knew nothing about the facts, testify to certain facts appearing on a sheet already in evidence. This would be like calling a witness to read a letter already in evidence. For this reason the rejection of the offer was certainly a proper one. Just what bearing the testimony, if admitted, would have had or whether material is not now clear. As a matter of fact it was already in evidence from a host of witnesses that empty cars did stand over at the Sonman mine, partly due to the defendant's conduct in furnishing cars irregularly late in the day and also in part to the custom of coal mines in desiring to have cars stand over night so as to be ready for operation in the morning when the miners come to work. Moreover, the offer standing alone would not appear to be relevant. If the empty cars standing over were in fact used by the defendant company's employees as a reason for not furnishing cars on the fol-

lowing day, the testimony might have been competent and relevant. Nothing of that kind, however, was included in the offer. On the whole we see no error in the rejection of the testimony.

Defendant contends:

"VI. Erroneous submission to jury of question whether defendant had discriminated against plaintiff in the distribution of its cars."

The plaintiff's statement contained a count charging discrimination, as well as a count charging an inadequate and insufficient supply of cars. Considerable testimony was offered and admitted tending to show discrimination by the defendant company in favor of Berwind-White Coal Mining Company and against the operators of the Mountain Division, which would include the plaintiff corporation. This testimony, as shown in the letters and telegrams of the defendant railroad company's officers, was sufficient to establish a clear case of discrimination. The claim, however, for discrimination was not pressed and no sufficient data offered on which to base a recovery in that respect. We do not understand that the claim was withdrawn but that the plaintiff admitted simply that it had not furnished the data on which the jury could base a verdict for discrimination alone. They asked, however, for a verdict on account of the insufficient and inadequate supply of cars; in other words, the failure of the defendant company to recognize its common law duty of furnishing a sufficient supply of cars on demand. Defendant now complains of the following line of instruction by the court to the jury, namely: "The testimony on the subject of discrimination should not enter into your consideration, except as it may show reasons for failure to furnish an adequate car supply." Defendant's counsel now contend that there was no evidence to justify the jury in finding that the plaintiff had been discriminated against. We submit that no one can read this evidence, and especially the letters and telegrams of the railroad

officials directing special orders of cars to be served to the Berwind-White Coal Mining Company, without coming to the conclusion that discrimination of the boldest kind was practiced. Our view of the law in stating that the jury could take that evidence of discrimination into their consideration as one of the reasons why an inadequate supply of cars was furnished to the plaintiff, would seem to be correct. If they were discriminating favorably as to the Berwind-White Company and unfavorably as to the Mountain region, it would certainly account for some of the default of the defendant company in furnishing cars to the plaintiff. Much more could have been said on the subject of discrimination under the proofs in this case. The little that was said was rather in favor of the defendant and if anybody has a right to complain, it seems to us that the plaintiff could with fairness complain that we treated the abundant discrimination proof somewhat cavalierly by disregarding it or making it of very minor importance. The proofs which show actual discrimination were admissible under either count and could not have been excluded, even though the counsel at the beginning of the case had stated that they would not attempt to recover by reason of discrimination. So far as the court is concerned the only reason why the matter of discrimination was not presented to the jury in full was that plaintiff failed to mathematically demonstrate the amount of injury sustained. We fail to see how the mild comment made by the court on the subject of the discrimination proven could have hurt the defendant.

Counsel for defendant further contend in their elaborate brief that:

"VII. The charge of the court was inadequate and misleading in the sense that it overstated the case of the plaintiff in the following material respects:"

"A"

Briefly the complaint in "A" was that the court misstated the proportion or percentage which the cars

received bore to the cars ordered. An examination of the testimony or sheets offered would indicate that this contention is correct and that the court did in a part of the charge state a lower percentage than actually is shown by the facts. The objection, however, should have been made at the time, when we would have gladly corrected the error. It is apparent too that the error is a legitimate result of merely glancing at the table, which was evidently before the court at the time, and if before the court was as fully before counsel, because it appeared in a table prepared by plaintiff, a copy of which was at the same time furnished to the defendant. The duty of the defendant's counsel to call attention of the court to any error or misstatement of fact appears in a number of recent authorities, where it is held, that a party may not sit silent and take chances of a verdict and then if adverse complaint of a matter which if error would have been immediately corrected by the court: Commonwealth v. Razmus, 210 Pa. 609; Reznor Mfg. Co. v. Railroad, 233 Pa. 369; Nowlis v. Hurwitz, 232 Pa. 154. The error of percentage stated was in a most casual reference in the following language: "If I had time, gentlemen of the jury, I would use more of these tables as I go along, but I think you understand that is the table in which they show the cars ordered in one column and the cars received in another column, drawing the comparison and showing, as I think counsel argued, about 15 or 20 or 25 per cent. probably running during the period." The learned counsel for defendant now say, in their brief, that the aggregate tonnage of cars ordered was 552,255 tons and the actual shipments 277,169 tons or over 50 per cent. of the tonnage for which cars had been ordered. We do not now understand the discrepancy, but evidently the exhibit before the court at the time the above language was used was Exhibit No. 43, which shows during the period 14,352 cars ordered and 3,186 cars delivered, to which is added steel cars equal to two or 1,961 cars, making a total of

5,147 cars delivered, counting steel as two. The proportion of 5,147 to 14,352 is a little over 35 per cent. So that there appears to be a discrepancy between this table and the one to which counsel refers. The error in figures doubtless came about by the court's glancing at the head of the column rather than at the close of the column, because during the several early months of the period the percentage is about as stated in the charge, while during the later months the percentage of cars delivered or received to those ordered becomes much larger. This latter fact the testimony also shows was not due to any increased liberality on the part of the defendant company, but was because the plaintiff company in its crippled condition was compelled to resort to selling its coal to Berwind-White Coal Mining Company and the Keystone Coal Company and receiving from those companies their private cars for its coal supply. During the later period, therefore, while it did receive cars, they were not the cars of the defendant company but were cars for which it had to negotiate by selling its coal to other operators and competitors of the region. The misstatement of evidence referred to we do not think of sufficient importance under the circumstances to involve a new trial in this case.

"B"

The complaint in this point is that as the court adopted the basis for the plaintiff's recovery the cars ordered by it and the testimony of a witness for the plaintiff, who was superintendent a part of the time during the period of the action, was to the effect that more cars were ordered than they could actually load an erroneous basis of recovery was permitted by the court. We fail to see how the testimony of Palmer, who was superintendent until October, 1904, is material in the light of the way in which the tables were presented and instructions of the court. The record will show that the tables prepared by counsel for plaintiff indicate that when cars were ordered in excess of the rating,

the recovery was limited by the difference between cars received and the rating, and when less cars were ordered than the rating the recovery was measured by the difference between cars received and cars ordered. Two months taken from the table illustrates the point:

|  | Rating fixed by deft. | Tonnage requisitioned | Tonnage shipped in cars rec'd | Loss in tons. |
|---|---|---|---|---|
| 1903 Sept. .. | 16080 | 19075 | 4941 | 11139 |
| 1905 July .. | 16080 | 7425 | 6454 | 971 |

In the general charge the court directs the jury that recovery is limited to the ability on plaintiff's part to actually mine the coal, loss of which it claims the right to recover. So also plaintiff's fourth point predicates recovery upon preparation by it "to load or ship the additional quantity of coal which it claims the right to have loaded and shipped." Plaintiff's 5A point as a condition precedent to recover requires the jury to find "that if plaintiff was prepared and able to mine and ship the coal that it here claims the right to ship." In view of these instructions, it is hard to see how the jury could have been misled by anything referred to in this complaint under the head of "B."

"C"

Under this subdivision complaint is made that the court did not sufficiently go into the minutiæ of certain cost charges. In the first place, if the defendant had wanted instruction in such matters, it was at perfect liberty to present requests for instruction, which would have been gladly given. An examination of the charge shows that the court made an effort to explain in considerable detail the claims of defendant against the tabulated statements presented by the plaintiff. All such matters were matters of argument to the jury and I think were ably argued by counsel on both sides. In a case of this magnitude, where such a wealth of detailed statements and tabulations are before the court, it certainly could not be expected that in the charge every

minute matter argued by counsel could be specially referred to by the court.

## "D"

Under this head is the complaint that the charge was inadequate and misleading· with reference to the selling price of the coal by the plaintiff company, in that the court failed to call the attention of the jury that the price asked for was in excess of the actual prices received. We think the comments of the charge on the matter of price were ample, especially in view of the proof on the part of the plaintiff that because of the treatment received they were compelled to take reduced prices. This because they could not guarantee delivery and hence could not command the higher prices to the best customers. And again, because during the latter portion of the period sued for they were, as they claim, because of the insufficient car service, compelled to sell their coal to competitors, who of course took their profit. Counsel further enters into an exhaustive argument, that the court failed to call the attention of the jury to the fact that had the car service been such as to furnish a car service equal to 100 per cent. of the rating the price of the coal would have been greatly reduced. This is an old argument, one used on behalf of the railroad company to justify their course of conduct in all such cases. The counsel, at least, seem to be greatly exercised for fear the coal business will be demoralized and the price consequently reduced. For this reason they seem to want to regulate the coal business. As a large customer for bituminous coal, the real interests of the railroad company would lie in a reduced price. The argument of counsel, frequently made, that the furnishing of cars according to the duty of the railroad company would result in demoralization of the coal trade, is a pure creature of imagination raised up to· justify the failure of defendant's officials to· do their· full common law duty to their shippers in the coal trade. The demoralization occasioned by the doing of its duty by the railroad com-

pany is purely imaginary. The coal trade would adjust itself like any other business in a very short time. Fierce and unnatural competition, sufficient to occasion demoralization, would soon vanish and it would be a question of the survival of the fittest along the most legitimate lines. Any other theory of the duty of a common carrier leads to rank discrimination and the greatest injustice to individual shippers, and the case in hand is an ample illustration of such injustice. According to the testimony, the plaintiff company had a splendid mine and a fine quality or grade of coal, its stockholders were men of standing and influence interested largely in concerns which were consumers of coal and satisfied with the product of the Sonman mine. The car service to plaintiff's mine was such, although times were normal, that the best of such orders were lost to plaintiff. A coal business, therefore, having the uncertainties and disastrous consequences amply proved in this case and wholly undenied, would be impossible and lead to inevitable bankruptcy to the strongest. The counsel for defendant company as a matter of fact must recognize this situation and know that the conduct of the defendant in this and other cases has been indefensible. Practically no defense or excuse to the discrimination practice has ever been offered. In this case, on the question of an inadequate car supply to the plaintiff company during normal times absolutely no excuse or defense of fact was offered. The defendant's counsel relied wholly upon principles of law which are untenable.

All of these complaints embodied under paragraph 7 as deficiencies or inadequacy of charge to the jury by the court are evidently picked out with great pains and industry on the part of counsel since the trial of the case. Had specific instructions been asked for on any one of the matters alleged, counsel certainly know that the court would have acceded to such request. It is impossible in the limits of a charge to touch upon everything there is in a case of this magnitude. To expect of

the court in its charge what is here set out, without special request, would have been to expect the court to make the argument, which was doubtless made to the jury at the time. If it was not, it was no fault of the court.

We have thus followed the course of argument as appears in the brief filed by the learned counsel for the defendant. We believe this brief covers practically all the reasons urged in the motion for new trial, except the one in which the verdict is alleged to be grossly excessive. This reason does not seem to be dwelt on by the learned counsel in their brief, hence must be assumed to be abandoned by them. If the verdict is in fact grossly excessive, it should be set aside or reduced by the court. The trouble with the verdict is in this case, that it is amply sustained by the evidence offered and the mathematical calculations deduced therefrom. We do not care to invade the province of the jury except under special circumstances which are not apparent in this case.

On the whole case, therefore, we are not convinced that a new trial should be granted and certainly that no verdict for the defendant could be entered by the court non obstante veredicto.

Verdict for plaintiff for $145,830.25, and judgment thereon. Defendant appealed.

*Errors assigned* were various rulings of the trial judge, and various instructions to the jury.

*Francis I. Gowen* and *John G. Johnson,* with them *Hazard Alex. Murray, Henry Wolf Bikle, James P. O'Laughlin* and *Thomas H. Murray,* for appellant.—The court below was without jurisdiction to entertain the action because of the exclusive grant of power to the federal tribunals which is contained in the ninth section of the Interstate Commerce Act: Chicago, R. I. & P. Railway Co. v. Hardwick Farmers' Elevator Co., 226 U.

SONMAN S. COAL CO. *v.* PENNA. R. R. CO., Appellant. 505

S. 426; Southern Railway Co. v. Reid, 222 U. S. 424; New York Central & H. R. R. Co. v. Board of Chosen Freeholders, 227 U. S. 248; Northern Pacific Railway Co. v. Washington, 222 U. S. 370; Yazoo & Mississippi Valley R. R. Co. v. Greenwood Grocery Co., 227 U. S. 217; Interstate Commerce Commission v. Ill. Cent. R. R. Co., 215 U. S. 452; Savage v. Jones, 225 U. S. 501; Puritan Coal Mining Co. v. Penna. R. R. Co., 237 Pa. 420; Penna. R. R. Co. v. Interstate Commerce Commission, 193 Fed. Repr. 81.

The defendant was not in default because unable to supply all the cars demanded by the plaintiff: United States v. Norfolk & Western Railway Co., 109 Fed. Repr. 831.

*A. M. Liveright* and *A. L. Cole,* for appellee.—The State court had jurisdiction to entertain the action: Missouri Pacific Railway Co. v. Larabee Flour Mills Co., 211 U. S. 612; Puritan Coal Mining Co. v. Pennsylvania Railroad Co., 237 Pa. 420.

The duty of a railroad company in ordinary times to have an adequate car supply, has been repeatedly recognized: Interstate Commerce Commission v. R. R. Co., 215 U. S. 452; Yazoo & M. V. R. Co. v. Blum Co., 88 Miss. 180 (40 So. Repr. 748); Hoffman Co. v. Ry. Co., 94 S. W. Repr. 597; Houston & Tex. Ry. v. Smith, 63 Tex. 322; Galveston, H. & S. A. R. Co. v. Wallace, 222 U. S. 205; Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426; Atlantic Coast Line R. Co. v. Riverside Mills, 219 U. S. 208.

OPINION BY MR. JUSTICE MESTREZAT, June 27, 1913:

The elaborate opinion of the learned trial judge denying the motion for a new trial and for judgment non obstante leaves nothing that can be profitably said in support of his conclusion sustaining the judgment from which this appeal was taken. We need but state briefly the facts and the issues involved.

This is an action of trespass brought by a coal operating company against the defendant, a common carrier, to recover damages for unlawful discrimination in the distribution of coal cars against the plaintiff company and for failure to furnish it an adequate and sufficient supply of cars under ordinary trade conditions. Both claims are based on the duty of the defendant as a common carrier, imposed by the common law and our constitution and statutory law. The claim for discrimination was not pressed and the case went to the jury on the claim for damages for failing to furnish an adequate supply of cars. This was divided into two parts: (a) damages for loss of profits on coal not mined because cars were not furnished to ship it, and (b) damages for the increased cost per ton of producing the coal mined over what the cost per ton would have been had cars been furnished sufficient to ship up to the actual capacity of the mine.

The defendant denied the right of the plaintiff to recover for the following reasons: The court below did not have jurisdiction of the action, only such portion of the coal which was intended ultimately to be delivered within the State can be recovered for in this action, defendant was not bound to supply all the cars demanded by the plaintiff, and plaintiff demanded only its pro rata share of the cars, which it got. The court ruled the two questions of law against the defendant and submitted the case to the jury who returned a verdict for the plaintiff on which judgment was entered. The defendant has appealed.

The case was carefully tried and was submitted to the jury in a clear and comprehensive charge reviewing the testimony and directing attention to all the questions of fact involved. It would serve no good purpose to examine and discuss the large amount of evidence produced at the trial. It is sufficient to say that after a painstaking examination of it all, we are satisfied that it warranted the finding of the jury.

The defendant company renews its contention here that the court below had no jurisdiction to entertain the action. It also contends that it was not in default because it was unable to supply all the cars demanded, that plaintiff made no demand for any cars other than those to which it was entitled under the defendant's distribution system, and that the court erred in excluding testimony offered to prove the number of cars off defendant's lines which would otherwise have been available for coal shipments. In an exhaustive opinion overruling the defendant's motion for a new trial and for judgment non obstante, the learned judge of the trial court deals at length with each of these propositions and shows that they are without merit. He points out that so far as they depend upon the facts, the finding of the jury against the defendant is amply sustained by the evidence. Under the well settled rule, this court cannot interfere with the jury's finding.

The controlling question of jurisdiction, a question of law, is dealt with by the court in its opinion, and the federal cases, with the exception of one or two recent decisions, and our two recent cases bearing on the question are cited, and sustain the learned judge's conclusion. We think it unnecessary to discuss this question as we must sustain the jurisdiction or overrule our own two very recent decisions in Puritan Coal Mining Company v. Pennsylvania Railroad Company, 237 Pa. 420, and Walnut Coal Co. v. Pennsylvania Railroad Company, 237 Pa. 410, which were ruled expressly on the authority of the Supreme Court of the United States. This we have no intention of doing. The Puritan and Walnut cases were brought against the defendant in the present case and were to recover damages for unlawful discrimination and failure to furnish plaintiff with an adequate and sufficient car supply. In both cases, the defendant denied the jurisdiction of the court and relied on the federal authorities, with the exception of one or two recent cases, cited and relied on here, to oust the

jurisdiction of the State court. The jurisdiction was sustained, and it was there held that where the act is an offense at common law, and made so as well by State statute, in such case, except as other reasons may be shown, there is concurrent jurisdiction of it in the State courts. In an exhaustive opinion in the Puritan case Mr. Justice STEWART, speaking for this court, says that the boundary line limiting State jurisdiction in matters which may affect interstate commerce has been clearly indicated by repeated decisions of the Supreme Court of the United States within recent years, and after reviewing the decisions continues (p. 453) : "Our own State statute rests for its authority on the police power of the State, and its sole object is to prohibit common carriers which derive all their powers from the State, and have been granted these to the end that they may serve public necessity and convenience, from practicing undue and unreasonable discrimination between shippers in the service they are created to render. The exercise of this power in the way indicated is not interfered with by the Interstate Commerce Act in the absence of action by the commerce commission specifically directed against the particular matter complained of. The thing condemned by our State statute and by the common law was a purely incidental matter indirectly affecting interstate commerce, just as was the discrimination in the case of the Missouri Pacific Ry. Co. v. Larabee Flour Mills, 211 U. S. 612. The two cases on principle cannot be distinguished, and we but follow the plain guidance of that case in holding that the power of the State with respect to the subject matter of the present controversy remains undisturbed. It was not a question in the case whether the cars denied the plaintiff were intended for shipment within the State or beyond. It was sufficient that the offense was committed within the State."

We are of the opinion that this case was properly disposed of by the learned court below and, therefore, the judgment is affirmed.