## J. NELSON RICKARDS *vs.* MOLLIE E. RICKARDS.

*Executed Sale Made on Sunday by Agent—Fraudulent Conveyances.*

An executed contract of sale made on Sunday by a general agent cannot be rescinded by his principal on the ground that the statute forbids the sale of goods on Sunday and the agent was not authorized to do an unlawful act.

When for the purpose of defrauding his creditors a party transfers property to another the transaction is voidable whether the transferee knew of the fraudulent purpose or not.

Appeal from the Circuit Court for Kent County (PEARCE, C. J. and BROWN, J.)    The following instruction was given as a substitute for the plaintiff's first and second prayers.

The Court instructs the jury that if they find from the evidence that prior to and on the 28th day of December, 1902, the plaintiff, Mollie E. Rickards, was the owner of the property described in the declaration, and that on the said 28th day of December, 1902, Harry N. Rickards, husband of said plaintiff, bartered and traded said property to the defendant, J. N. Rickards, and delivered possession thereof to him, and shall further find that said 28th day of December, 1902, was the Sabbath Day commonly called Sunday, then their verdict must be for the plaintiff even though the jury may further find from the evidence that said Harry N. Rickards was prior to and at the time of said trade and barter the general agent of said plaintiff.

*Defendant's 3rd Prayer as Amended.*—Even if the jury shall believe that the horse, Christian, belonged to Mrs. Rickards, yet, even if the jury also believe that her husband was her general agent to manage, sell, trade or exchange her property for her according to his best judgment and discretion, and that he, in exercise of such authority traded said horse to the defendant for a valuable consideration and delivered the same to him, then the verdict must be for the defendant, unless the

jury shall find from the evidence that the said trade or barter was made on Sunday.  (*Granted.*)

*Defendant's 6th Prayer as Amended.*—It is for the jury to decide, from all the facts and circumstances in evidence, whether the horse Christian was purchased by Mrs. Rickards with her own money through her husband as agent, or whether it was purchased by him for himself and her name used with her knowledge and consent merely as a colorable device to hinder, delay or defraud his subsisting and subsequent creditors and purchasers.  (*Granted.*)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, SCHMUCKER and JONES, JJ.

*Albert Constable* and *H. W. Vickers*, for the appellant, submitted the cause on their brief.

The Court below decided that, notwithstanding Dr. Rickards' was his wife's general agent to manage, sell, trade or exchange her property according to the best judgment and discretion, that is to say, notwithstanding she had bestowed upon her husband for the purpose of dealing with her property, the widest possible power, imposing no restrictions whatever as to the mode, manner, time or place of its exercise, yet, because in exercising the admitted powers of his agency he unfortunately exposed himself to the penalty prescribed by the State for a violation of the Sunday law, that fact decides his act to be without the scope of his authority, and the exchange made by him to pass no title to the property, though fully executed. The general rule we had always supposed to be, that whatever the servant does in the course of the employment with which he is entrusted, and as a part of it, is the master's act, so far as *civil* rights and liabilities are concerned.   And we submit that the true test is that which was stated and acted on by the English Court of Appeal in *Hamlyn* v. *Houston & Co.*, L. R., 1 K. B. 81, namely, Was it within the scope of the authority given to Dr. Rickards to trade this horse to his brother by an exchange made by him on a week-day ?  If so,

it was within the scope of his authority for the present pur-
pose to make the exchange on Sunday.    The mere fact that
in making the trade, *otherwise clearly within the scope of his
authority*, he exposes himself to a penalty, cannot in reason or
law, afford a test as to whether the exchange was within the
scope of his authority.    It is not a question of criminal, but of
civil liability.    In *Hamlyn* v. *Houston*, LORD JUSTICE MAT-
THEW said (p. 86), "It being within the scope of his authority
to procure the information, it is immaterial for the present pur-
pose whether the acts which he committed in order to pro-
cure it were fraudulent or *even criminal* or not."    See also
*Tome* v. *The Parkersburg Branch R. R. Co.*, 39 Md. 36; *Evans.
v. Davidson*, 53 Md. 245; *Hamlyn* v. *Houston & Co.*, Law
Rep. (1903), 1 K. B. 81; *Barwick* v. *English Joint Stock Bank*,
L. R., 2 Excheq., 259; *Mackay* v. *Commercial Bank of New
Brunswick*, L. R. 5 P. C., 394, 411; *Swise* v. *Francis*, L. R.,
3 App. Case, 106.

*Charles F. Harley* (with whom were *Albert G. Towers* and
*Fred. R. Owens* on the brief), for the appellee.    .    .
If the title to the property was originally in the plaintiff—
she could not part with the title on Sunday through an agent.
*Roddy* v. *Finnigan*, 43 Md. 501; 1 *Am. & Eng. Ency. of Law*,
2nd ed. 971.    She is in no way dependent upon the illegal
transaction for her title, while the claim of the defendant rests
wholly upon an alleged unlawful contract.    "The true test for
determining whether or not, the objection that the plaintiff
and defendant were *in pari delicto* can be sustained, is by con-
sidering whether the plaintiff can make out his case other-
wise than through the medium and by the aid of the illegal
transaction."    *Brooms Legal Maxims*, 692.
In the case at bar, the attempted transfer of title by the
agent was, not merely voidable, but altogether null and void.
1 *Am. & Eng. Ency. of Law*, 2nd ed. 971, 972; *Heugh* v. *Aber-
gavenny*, 23 W. R. 40; *Pearce* v. *Foote*, 113 Ill. 228.    The
title, therefore, of necessity remained in the principal; she is
in no way dependent upon the illegal transaction for her title;

and the doctrine of *par delictum* has no application.   She could not give title on Sunday through an agent.   *Roddy* v. *Finnigan*, 43 Md. 501.

The contract of barter or trade was therefore, unexecuted; and, while the Court will not enforce alleged rights resting upon an executory prohibited contract, as long as the agreement is unexecuted and the *delictum* incomplete, the Court will take cognizance of the matter.   *Anderson's Dictionary of Law*, 335.   It is thus clear that the title of the plaintiff has never been divested.   She is not before the Court asking for the rescision of a voidable executory unlawful contract.   Her title is altogether independent of the contract set up in the evidence; the contract in question is absolutely void; it cannot be executed by an agent; and no title has passed to the defendant who alone depends for his title upon the alleged Sunday contract.

The barter or trade in question was unlawful.   *Code*, Art. 27, sec. 248;  14 *L. R. A.*, 193; *State* v. *Popp*, 45 Md. 432.

The wording of the law (goods, wares and merchandise) embraces the articles mentioned in the declaration.   The word *goods* embraces movables household furniture, *horses*, cattle, etc.   14 *Am. & Eng. Ency. of Law*, 2nd ed. 1079; *Anderson's Law Dictionary*, 490; *The Elizabeth and Jane*, 2 Mason, 407; *Ibid*, 4 Blatch. 136.   The language includes *horses*.   *Bartholomew* v. *Freeman*, 3 C. P. D. 316; *Richmond Hill S. B. Co.* v. *Trinity House*, 12 B. 493; *Gower* v. *Gower*, 2 Eden, 206; *State* v. *Ward*, 49 Conn. 442; *Weston* v. *McDowell*, 20 Mich. 357.

It is against the policy of the law to permit a party to authorize another to do an unlawful act.   *Roddy* v. *Finnigan*, 43 Md. 501; *Story on Agency*, sec. 11; *Reinhart on Agency*, sec. 186; *Mechem on Agency*, secs. 19 and 20; 1 *Am. & Eng. Ency. of Law*, 2nd ed. 971.

McSHERRY, C. J., delivered the opinion of the Court.

On Sunday, December 28th, 1902, Dr. Harry N. Rickards, acting as agent for his wife, Mollie E. Rickards, the appellee, traded a certain horse belonging to or alleged to be owned by

the appellee, to the appellant, J. Nelson Rickards, and forthwith delivered the horse to the appellant. Two days afterward the appellee sued out a writ of replevin to recover the horse. The record was removed on the suggestion and affidavit of the appellee from the Circuit Court for Caroline County to the Circuit Court for Kent County, where the case was finally tried. A verdict and judgment were entered in favor of Mrs. Rickards; and J. Nelson Rickards has appealed. The controlling question passed upon below and now brought here by the pending appeal is this: Was the transaction—the barter or trade of the horse as made by the appellee's agent—confessedly consummated and fully executed on Sunday—a transaction which did not bind the appellee, because made on Sunday? That question is raised by the prayers presented for instructions to the jury.

The agency of the appellee's husband is not disputed. The barter or trade is not denied. The delivery of the horse in accordance with and at the time the transaction was entered into is conceded. The point of contention is that as a contract of sale or barter or trade made on a Sunday is invalid, the principal, Mrs. Rickards, cannot be bound by the illegal act of her agent and that she may therefore repudiate the transaction and reclaim the horse.

No executory contract of sale made upon Sunday can be enforced. All parties agree to that proposition. But an *executed* contract though made on Sunday cannot be avoided merely because it was entered into on a *dies non*. A contract entered into on Sunday is a contract prohibited by the law; but as said by Lord Chief Justice Wilmot in *Collins* v. *Blantern*, 2 Wilson 341: "Whosoever is a party to an unlawful contract, if he hath once paid the money stipulated to be paid in pursuance thereof, he shall not have the help of a Court to fetch it back again;—you shall not have a right of action when you come into a Court of Justice in this unclean manner to recover it back." And so in the case of the *Inhabitants of Worcester* v. *Eaton*, 11 Mass. 368 decided in 1814, in an able and elaborate opinion delivered by Chief Justice

PARKER, it was said: "There have been some cases in England which look as if in all instances where a party has paid money upon an illegal transaction, he may recover it back again in an action for money had and received. But it is now unquestionably settled there, that an action for money so paid, cannot be maintained where the parties are really in *pari delicto*; and upon looking into all the cases upon the subject * * * it will appear that a distinction is maintained between those cases in which one of the parties has, by an illegal act, taken an advantage of, and oppressed the other, and those in which it is not possible to distinguish between the parties as to the degree of their criminality. Thus where usury has been paid, it is considered that the lender has availed himself of the distress of the borrower and has violated the law to extort from him more than the lawful rate of interest. In this case, an action for money had and received will lie for the excess. * * * But that in all acts which are unlawful on account of their immorality or because they are hostile to public policy, there the parties to the act are in *pari delicto* and *potior est conditio defendentis.*" See also *Kelley s. Cosgrove*, 83 Iowa 229; s. c. 17 L. R. A. 779.

It is obvious, then, that the executed contract entered into between the appellee's agent and the appellant is binding on the appellee even though it was consummated on Sunday, unless the fact that it *was* made on Sunday and consequently was unlawful, of itself, took it out of the scope of the agent's authority to make it. And here lies the stress of the case. The agent's authority was general and unrestricted. It was not limited to the sale or barter of the horse on a secular or business day; but the argument is that a term must be read into the agent's power whereby implicitly he was prohibited from doing any illegal act; and as the sale on Sunday was an illegal act, it was an act beyond the scope of his authority and therefore not binding on the appellee. This argument begs the question—a sale or barter of the horse was confessedly within the delegated authority of the agent, and the *method* he pursued in performing what he was empowered to

perform cannot make the thing he did, a thing he had no power to do.   This is not an inquiry into a criminal liability. The mere fact that an agent in the course of exercising a delegated authority himself violates a prohibitive statute, does not liberate or discharge the principal from the obligations of the contract, if the contract be one within the scope of his authority.   This doctrine is well illustrated in a recent case decided by the English Court of Appeal.   In *Hamlyn* v. *Houston & Co.*, L. R. (1903) 1 K. B. 81, the Master of the Rolls said:

"It is too well established by the authorities to be now disputed that a principal may be liable for the fraud or other illegal act committed by his agent within the general scope of the authority given to him, and even the fact that the act of the agent is criminal does not necessarily take it out of the scope of his authority.  If the act done by the agent is within the general scope of the authority given to him, it matters not for the present purpose that it was directly contrary to the instructions of his principal, or even that it may have been an offence against society itself.  The test is that which is applied to this case by the learned Judge, was it within the scope of the authority given to Houston to obtain this information by legitimate means?  If so, it was within the scope of his authority for the present purpose to obtain it by illegitimate means, and the defendants are liable."   And in the same case JUSTICE MATTHEW stated (at p. 86), "A little confusion has been introduced into this case by the reference made to the criminal law.  It is not suggested that Houston's partner would be liable criminally; the question is only one of civil liability.   The rule of law applicable is perfectly plain.   The question is whether the action of Houston was within the scope of his authority for the purpose of making the firm liable.   I think the jury were entirely warranted in finding that Houston was authorized to obtain information as to the contracts and tenders made by competing firms by legitimate means.   He did obtain such information by illegitimate means. It being within the scope of his authority to procure the in-

formation, it is immaterial for the present purpose whether the acts which he committed in order to procure it were fraudulent or even criminal or not, and his partner is responsible for those acts."

This Court speaking through former CHIEF JUDGE ALVEY in *Evans* v. *Davidson*, 53 Md. 249, announced substantially the same doctrine in these words:

"In one sense, where there is no express command by the master, all wrongful acts done by the servant may be said to be beyond the scope of the authority given; but the liability of the master is not determined upon any such restricted interpretation of the authority and duty of the servant. If the servant be acting at the time in the course of his master's service and for his master's benefit, within the scope of his employment, then his act, though wrongful or negligent, is to be treated as that of the master, although no express command or privity of the master be shown."

It does not need any further citations of adjudged cases to support the proposition that the principal cannot repudiate an executed contract merely because the agent in the method followed or adopted in making it, has violated the law prohibiting a contract from being entered into on Sunday, if the contract itself when made and after being executed was one which it was within the scope of the agent's authority to make for and in behalf of his principal. With this proposition established we may now turn to the prayers which were presented by both of the parties to the cause.

The appellee asked five instructions and the appellant asked six. Of the five requested by the appellee the Court granted the third and fifth as offered and gave an instruction of its own in place of the first and second and rejected the fourth which is not found in the record. The appellant's first prayer was conceded, his fourth and fifth were granted, his second, third and sixth were rejected, and in lieu of the third and sixth the trial Court substituted two of its own. The rulings thus made, except as respects the rejection of the appellee's fourth prayer, are the errors alleged on this appeal.

The Court's substitute for the appellee's first and second prayers as well as the appellee's fifth prayer broadly lay down the assertion as a legal principle that as the barter of the horse was made and completed on Sunday, the appellee was entitled to repudiate the transaction and to reclaim possession of the property. The modification made by the trial Court of the appellant's third prayer incorporates the same theory though the prayer as presented originally in effect asks the Court to inform the jury that the barter was binding on the appellee even though made on Sunday, provided the transaction was within the scope of the agent's authority and was fully executed. From what we have heretofore said it obviously follows that there was error in granting the substitute for the appellee's first and second prayers and in granting her fifth prayer and in modifying the appellant's third prayer. The appellee's third prayer merely asserts an abstract proposition. It is not perceived how it could have caused any injury. The appellant's second prayer was rejected, but no injury was done him because the same proposition in somewhat different words is covered by the fourth prayer which was granted. The sixth prayer as offered told the jury that it was for them to decide from all the facts and circumstances whether the horse was purchased by the appellee with her own money through her husband as agent, or whether it was purchased by him for himself and her name was used merely as a colorable device to hinder, delay or defraud his subsisting or subsequent creditors. The prayer thus framed was rejected, but the Court amended it by inserting the words "with her knowledge and consent," so that the proposition it announced was this: If the horse was in fact bought by the appellee's husband with his own money and the title thereto was put in the appellee's name with a view to delay, defeat or defraud the husband's creditors, the appellee could still recover possession of the horse in replevin unless she knew of or consented to the fraud perpetrated by her husband. The qualification added by the Court was erroneous. The appellee was not entitled to recover if in point of fact the horse belonged to her husband.

If her husband had fraudulently put the title in her name her want of knowledge of the fraud gave her no better title than if she had been fully aware of the intent imputed to her husband. Her situation was not that of a *bona fide* purchaser for value without notice or knowledge of the vendor's fraudulent design. The whole question so far as the sixth prayer was concerned was limited to the inquiry as to *her*, the appellee's ownership of the horse ; and whether she was innocent of or an accomplice in the fraud of her husband was wholly immaterial if the horse belonged to him and he merely put the title in her to hinder or delay his creditors.

For the errors we have indicated, viz., the granting of the appellee's fifth prayer and the granting of the Court's substitute for the appellee's first and second prayers, and for the rejection of the appellant's third and sixth prayers and the granting of third and sixth prayers as modified by the Court the judgment must be reversed and a new trial will be awarded. It is accordingly so ordered.

> *Judgment reversed with costs above and below and new trial awarded.*

(Decided December 3rd, 1903.)